No. 37,087

GEORGE MILLER, *Petitioner,* v. R. H. HUDSPETH, Warden of the State Penitentiary, and EDWARD F. ARN, Attorney General, *Respondents.*

(192 P. 2d 147)

Opinion filed April 10, 1948.

*Edward Rooney,* of Topeka, argued the cause, and *J. A. Dickinson* and *David Prager,* both of Topeka, were with him on the briefs for the petitioner.

*H. R. Fatzer,* assistant attorney general, and *Willis H. McQueary,* county attorney of Miami county, argued the cause, and *Edward F. Arn,* attorney general, was with them on the briefs for the respondents.

The opinion of the court was delivered by

WEDELL, J.: This is an original proceeding in habeas corpus.

The petitioner, George Miller, was convicted and sentenced to death by hanging pursuant to a plea of guilty on the charge of murder in the first degree. Execution of sentence was stayed by this court pending the hearing and determination of the appeal and until further order of this court.

The petitioner is a negro and employed counsel of his own race in the criminal case. Subsequently this court, under circumstances to be stated later, appointed the Honorable Edward Rooney with directions and authority to confer with appellant and his counsel and to do any and all acts proper to present that case to this court and to take such further proceedings as he deemed necessary or proper to have the legal rights of the appellant adjudicated. Pursuant to such authorization appointed counsel alone filed the instant proceeding in habeas corpus.

Omitting formal parts of the verified petition it first, in substance, alleged: The appeal in the criminal case was wholly ineffectual to raise any issue and to give this court an opportunity to do substantial justice to the appellant.

The petition, in substance, further alleged the petitioner's imprisonment under the death sentence violated the law of this state and the state and federal constitutions in the following respects, to wit:

I. Petitioner was convicted and sentenced to die without due process of law as defined by the state and federal constitutions.

II. Petitioner was not properly represented by counsel as required by the state and federal constitutions and the statutes of Kansas.

III. Petitioner's plea of guilty was entered while in mortal fear of death at the hands of a mob which had severely beaten him causing injury to his body and impairing his hearing (the injuries were alleged) ; the fear and pain combined impaired petitioner's judgment, reason and discretion; he was not aware of his constitutional rights and was not given a fair opportunity to defend himself or to prepare for trial.

IV. At the hearing to determine his sentence no evidence was introduced in his behalf by his counsel to show he had been an honorable citizen prior to the instant offense or to show his age, his meager education or the nature of his intellect.

V. The trial judge misapprehended the test and the basis in law governing the choice between the infliction of death and life imprisonment under the Kansas statutes and abused his discretion and denied the petitioner the equal protection of the law.

VI. The court was without jurisdiction to accept a plea of guilty or to pronounce sentence and the judgment and sentence were null and void.

VII. Petitioner did not have the benefit of counsel as provided by law and the court, therefore, was without jurisdiction.

VIII. The petitioner was *non compos mentis* due to a combination of fear, pain from the results of mob violence at the time of his arrest and ignorance and the court was without jurisdiction and the proceedings were void.

The verified answer and return of respondents, warden of the state penitentiary and the attorney general of the state, denied all allegations of the petition not thereafter admitted and, in substance, further alleged: No cause of action for the requested relief was pleaded; petitioner entered his plea of guilty to the crime of murder in the first degree and his plea was accepted in conformity to law (certified copies of judgment, sentence, death warrant, commitment, report of federal bureau of investigation and the order of this court suspending sentence were attached); petitioner was at all times represented in the district court by Leroy E. Harris, a member of the bar, whom petitioner employed; an appeal from the judgment and sentence of the district court was pending in this court; the final judgment and sentence of the district court were valid and entitled to full faith and credit.

We pause to state the report of the federal bureau of investigation disclosed no arrest or prosecution of the petitioner save the one now under consideration.

This court appointed the Honorable Elmer W. Columbia as its commissioner to hear the evidence and make suggested findings of fact and conclusions of law. The commissioner concluded the writ should be conditionally allowed, that is, since the defendant was in custody he should not be discharged but should be returned to Miami county and be given an opportunity to withdraw his plea of guilty

and to have such other lawful proceedings as might be just and proper.

The petitioner moved to have the findings and recommendations of the commissioner approved. Respondents filed objections to portions thereof and to the allowance of the writ. The report of the commissioner will be treated later. This being an original proceeding the commissioner's findings are only advisory. The burden is on this court to determine the facts on the basis of the entire record. (*Bissell v. Amrine*, 159 Kan. 358, 155 P. 2d 413.).

The entire proceedings in the criminal case were made a part of the instant proceeding. A statement of the chronological order of events is: February 3, 1947, commission of alleged offense; February 5, arraignment in justice court; February 10, preliminary hearing in justice court; February 13, information filed in district court; March 5, arraigned and plea of guilty; March 11, evidence presented to district court to determine the sentence pursuant to G. S. 1947 Supp. 21-403; March 11, plea accepted; March 15, sentence pronounced and motion for new trial filed; March 19, motion for new trial argued and overruled; March 20, appeal filed; April 4, this court stayed order of sentence; September 13, petition in habeas corpus filed; October 8 and 9, hearing before commissioner; December 4, hearing in this court; December 4, 1947, motion filed by counsel in criminal case to dismiss appeal in that case.

The motion to dismiss the appeal in the criminal case remains before us.

There appears to be some repetition in the petition for the writ. In the brief of petitioner two principal grounds are urged for the writ. The first is that the representation petitioner received was so inadequate as to render the plea of guilty a nullity. The second is the trial court misunderstood the test or basis for determining the sentence to be imposed.

It will be observed the second ground pertains solely to the sentence pronounced and not to the judgment of conviction rendered pursuant to petitioner's plea of guilty to the charge of murder in the first degree. If the second contention were sound it would not warrant releasing the prisoner from custody. It could only affect the sentence imposed. In this state any person convicted of murder in the first degree is punished by death or by confinement for life. When there is a plea of guilty to the charge of murder in the first degree the court determines the punishment to be inflicted but before doing so it is required to hear evidence. (G. S. 1947 Supp.

21-403.) The statute might well have been specific in directing the general scope, nature and character of the evidence to be considered. The fact it does not do so leads us to infer the lawmakers believed trial judges would consider all facts and circumstances reasonably necessary to make a proper decision involving the life or death of a human being.

In an appealed case this court will not disturb a sentence imposed by a trial court on the ground it is excessive provided it is within the limits prescribed by law for the exercise by the trial court of its discretion and is not the result of partiality, prejudice, oppression or corrupt motive. (*State v. Bradley*, 130 Kan. 759; 288 Pac. 735.) A proceeding in habeas corpus which attacks the validity of a judgment is a collateral attack on the judgment. (*In re Light*, 147 Kan. 657, 660, 78 P. 2d 23.)

Assuming the second ground pertaining solely to the sentence may be raised in a habeas corpus proceeding we clearly would not be justified in doing more in such a collateral proceeding than we could on a direct appeal.

Since the record of the criminal case in the district court casts not only light upon the second contention of petitioner but also upon his other complaints made in the instant proceeding such as petitioner's alleged failure to understand his right to trial by jury, that he did not know what a plea of guilty meant or what the penalty might be it is well to review that record. It would also appear wise to consider the district court record before considering the testimony introduced in the habeas corpus proceeding seven months after the plea of guilty.

As previously indicated the plea of guilty was entered over four weeks after the alleged crime was committed and more than three weeks after the preliminary hearing.

On arraignment in the district court the trial judge inquired of Miller whether he was represented by Leroy E. Harris as his attorney. Miller answered in the affirmative. Thereafter the record discloses the following:

"THE COURT: Have you had a chance to talk with your attorney? A. Yes sir, I have.

"THE COURT: Did you talk to your attorney this morning? A. Yes, a little bit.

"THE COURT: An Information has been filed charging you with murder in the first degree and what we are doing now is to arraign you. That is, we are informing you of this charge. The charge will be read to you by the

clerk and you will listen to the reading of this Information and after the Information has been read then you will be asked to plead, *but before you plead the Court must further talk to you.* You will now listen to the reading of the information. (The clerk here reads the Information.)

"THE COURT: Defendant, George Miller, you will now be required to plead to the Information. You may stand mute and not answer anything, *in which event the Court will order a trial to a jury and you may enter a plea of Not Guilty* or you may enter a plea of Guilty.

"*Now, a plea of guilty* to an Information charging murder in the first degree *means* that you may be imprisoned for life or *that you may suffer the death penalty.* Now, having been informed by the Court *and I take it informed by your attorney,* how do you plead to the Information just read to you?

"MR. HARRIS: Guilty, Your Honor.

"THE COURT: What does *the defendant* say about it? A. (By the defendant) Guilty.

"THE COURT: *Is that your plea?* A. Yes sir.

"THE COURT: *You enter a plea of guilty to this Information?* A. Yes sir.

"THE COURT: *And you understand now what that plea* may mean?

"MR. HARRIS: Yes sir.

"THE COURT: Do *you* understand that—so the Reporter may get it? A. Yes sir.

"THE COURT: You may be seated. (The defendant is seated.)

"THE COURT: The Court has noted and entered your plea of guilty. That, however, doesn't end the matter because under the law the determination of the punishment will have to be by the Court. *The Court takes it that under the law that even a plea of guilty is not a final determination but the plea also has to be approved and in order to determine the matter of punishment and acceptance of the plea the Court will hear evidence."* (Our italics.)

After a discussion of a convenient day for hearing such evidence the court stated:

"*There is no hurry* and the *defendant* still *has his rights* to have the evidence presented and heard and considered and *he still has the right to offer evidence which he might deem expedient."* (Our italics.)

After setting the hearing for March 11, the court said:

"The defendant is remanded to the custody of the sheriff and if his attorney wishes to further confer with him you may do so."

On March 11 the state introduced the testimony of eleven witnesses and Harris cross-examined eight of them. Some of the cross-examinations were quite extensive.

The testimony at that hearing, in substance, was:

The Millers lived in Osawatomie, Miami county. They had lived together about eight years. Miller was fifty-seven years of age. So far as Mrs. Miller knew her husband was a peaceful citizen with

other people. Miller had been nagging at and quarreling with his wife from Friday, January 31, to February 3, 1947. Miller was not drunk. He did not drink. The quarrel climaxed during the night of February 2 and the early morning hours of February 3. On Friday Miller wanted his wife to put money due to her on an unemployment compensation check into their bank account. She refused to do so. Mrs. Miller had been fearful of her safety and had hidden a pistol Miller had borrowed from a friend. On Sunday morning, February 2, Miller demanded that she produce the pistol but she did not do so. She went to church and on her return he talked about selling the home. She finally agreed and said, "Anything for peace." Nothing further happened until about seven o'clock that night. Miller then claimed $10 of his money was missing. His wife said she had not seen the money. Miller decided to go to St. Louis and wanted to get a pass from the railroad company for which he was working. Mrs. Miller did not want him to go as one of the two grandchildren staying with them had to be taken to the doctor on Tuesday and she feared he would not return in time. There previously had been some trouble about his grandchildren being in their home. Miller called the agent of the railroad company and he got his pass. Nothing further was said at that time and Mrs. Miller retired. Sometime during the night Miller woke her and demanded she produce the pistol. She feared what he might do and refused to produce it. Miller then struck her twice with his fists. Mrs. Miller still refused to get the pistol. He then struck her in the face with a water glass which broke, cut her face and the glass scattered over the bed. She continued to refuse to get the pistol. He then struck her on the head with a loaded double-barreled shotgun. She refused to get the pistol. He then pointed the shotgun at her. She produced the pistol.

Thereafter they sat in chairs facing each other for some period of time. Mrs. Miller finally went to bed. Sometime later Miller came and lay down on the edge of the bed with his clothes on and with his feet on the floor. When they got up in the morning Mrs. Miller was afraid to try to leave and whispered to the nine-year-old granddaughter to get the police. Mrs. Miller remained at home until about 8:45 a. m. and then got away by telling Miller she would go and sign up for her unemployment compensation. She went to the police station and filed a complaint for his arrest. The chief of police, Mike Churchill, went to the home to serve the war-

rant. Harvey Earp, the city engineer, who also held a deputy's commission, took the chief to the Miller home in his car. Mrs. Miller was advised to remain at the police station.

When the chief and Earp arrived at the Miller home the south front door was locked. They looked into the east windows and saw no one but heard a baby crying. The chief then tried the back or north door of the house. It was also locked. The garage was in the back or north part of the lot facing the south. It had a south door and a north double door at the alley. A narrow walk led to the garage from the back of the house but the officers did not go to the garage at that time. They looked around town where they thought Miller might be found but failed to locate him. Mrs. Miller was later notified the officers were unable to get into the house. The officers returned to the house and Mrs. Miller came, borrowed a neighbor's axe and pried the front door open. The officers searched the house but Miller was not there. While there is a slight variation as to the exact length of time that intervened between the two trips to the house it appears it may have been anywhere between forty minutes and an hour.

Mrs. Miller suggested they look in the garage. They did not have an automobile. The chief was dressed in his officer's uniform. They approached the south door of the garage on the narrow sidewalk with the chief leading the way, Mrs. Miller behind him and Earp following. The chief's gun was in the holster as they approached the garage. Earp had no gun but did have a blackjack. Miller knew the chief and the chief knew Miller. The chief called for George Miller by saying, "George!"—"George!" He did not answer. When the chief was near enough to the door to see it was locked—approximately five or six feet away—a shot was fired through the south door of the garage. It hit the chief and he died before he could return to the house.

Mrs. Miller and Earp testified a second shot was fired. It appears that occurred after they got into the house although Mrs. Miller thought it might have been as she was going out the front door. Earp saw Miller running north after he came out of the alley behind the garage. Miller's twelve-gauge double-barreled shotgun and his open pocket knife were found near the front door in the garage. One discharged shell from the gun was found on the floor. One shell in the right chamber was a "dud." It indicated the trigger had been pulled but the shell had not fired. A round blue chalk

mark was observed around a hole on the inside of the south garage door. Around the hole powder burns were visible. Freshly removed pieces of wood were found. They fitted into the edges of the hole in the door. The hole was large enough to receive the barrel of the shotgun. Mrs. Miller had not previously noticed the hole in the door.

Following the killing a posse was formed to find Miller. He was located about 12:30 p. m. in the loft of another garage about three blocks removed. A mob had gathered which was threatening Miller's safety. The officers dispersed the mob and took Miller to the county jail of Miami county at Paola and from there to the county jail of Douglas county for protection against possible mob violence.

During the same evening the Miami county attorney had a conference with Miller in the jail in the presence of other officials and a stenographer. Miller discussed the shooting freely at that time and signed a written statement. It was offered in evidence but the offer was later withdrawn by the state.

A crowd of seventy-five to one hundred persons had gathered around the garage where Miller was found hiding. Many of them had guns and were demanding that Miller come down, which included the demands of at least one officer. When Miller did not descend officers fired shots into the top part of the garage. One of them fired three shots. Miller first threw his cap down and then descended by swinging from the rafters. The crowd rushed into the garage. The officers said they heard no threats to Miller. The officers searched Miller and found three twelve-gauge shotgun shells in his jacket pocket. A five shot .38-caliber loaded revolver was found near the boards in the loft where Miller had been lying. One shell in the pistol had been fired and four were not discharged. The sheriff was not present when Miller was apprehended and he first saw him in the jail at Paola. There was no demonstration or mob violence of any kind or character after Miller was taken into the custody of the sheriff. The sheriff of Miami county talked to Miller shortly after noon in the county jail at Paola. Miller freely admitted he had shot the chief. The sheriff testified, "I asked him why he killed the policeman" and "he said he was mad."

After hearing the testimony on March 11 the court advised Miller and his counsel it would hear anything Miller might desire to say to the court if his counsel thought it should be offered. A consultation followed between Miller and Harris out of the hearing of others present. Thereafter Harris announced they would rest their case.

The court then stated it desired to ask Miller some questions but that Miller was under no duty to answer if he preferred not to do so. The court, with the consent of Miller's counsel, interrogated Miller concerning his past personal life but carefully avoided everything which might tend to incriminate him. That testimony, in substance, was:

Miller went to school in Mississippi but did not obtain much education. For the last two years he had been working on track maintenance for the railroad company. Leroy E. Harris was his attorney. He had known Harris about three or four weeks. He had never been in a penitentiary or jail prior to this. He had seen Mr. Harris several times since his arrest and had consulted with him on several occasions. He talked with Harris each time he was in court. Since he had been arrested no one had tried to harm him. He had gotten along fine with the sheriff and the sheriff's force. He remembered the day he was asked to plead guilty or not guilty. Before that time no one had made any promises to him. The county attorney had not told him what would happen to him if he pleaded guilty. He talked to the district court judge only in the courtroom. He had two children by a former wife who is dead. The children knew about this trouble but were not present at the hearing. He did not have anything to say and had no questions to ask the court.

The court granted a recess until March 15. Before recessing, however, the court again inquired of Miller and his attorney separately whether there was anything they would like to say to the court. Both answered in the negative. The court further inquired of Miller whether he was in need of any medical attention, to which Miller answered in the affirmative. The court stated:

"Well, I think the sheriff will take care of that situation if you tell him about it."

The journal entry of judgment discloses the court accepted the plea of guilty on March 11. When court reconvened on March 15 and before reviewing the record and pronouncing sentence the court said:

"Mr. Harris, although testimony was taken in this case, does the defendant have anything more to say to the Court by way of informing the Court? Any other voluntary statement to make at this time?

"MR. HARRIS: We have nothing further to present to the Court at this time, Your Honor.

"THE COURT: *You have had an opportunity this morning to confer with your client?*

"Mr. Harris: *Yes, Your Honor.*

"The Court: No notice of a filing of a motion for a new trial had been given. Such notice should probably be given and the motion heard before entering judgment. However, I have noticed that the Supreme Court is very lenient in the matter of procedure and if there is nothing more, then the Court will review this case." (Our italics.)

Near the conclusion of a review of the record the court stated:

"The attorney for the defendant has skillfully created an atmosphere of sympathy which is not ignored by the Court but it is not a defense . . . Mr. Miller, at this time do you have any legal cause to offer why sentence and judgment of the Court should not be pronounced upon you?

"Mr. Harris: None, Your Honor.

"The Court: I want to hear from Mr. Miller.

"Mr. Miller (the defendant): I ask that the Court please forgive me."

A motion for a new trial was filed on March 15. It was argued and overruled on March 19.

We now have before us the district court record pertaining to the plea of guilty and the sentence. If the question of sentence is properly before us in the instant proceeding we have no hesitancy in saying the record discloses no basis upon which this court can set the sentence aside as void. Unless it is void it, of course, cannot be overthrown. (*In re Light,* 147 Kan. 657, 78 P. 2d 23.)

Was the judgment of conviction void by reason of the alleged failure of petitioner to understand he had a right to trial by jury, that he did not know what a plea of guilty meant or what the penalty might be? These questions are related to the contention petitioner was inadequately represented by his own selected counsel. It is well on the outset to state some definitely established principles. A judgment following a plea of guilty carries with it a presumption of regularity. (*Crisp v. Hudspeth,* 162 Kan. 567, 569, 178 P. 2d 228.) Such a judgment cannot be lightly set aside by a collateral attack on habeas corpus. (*Engels v. Amrine,* 155 Kan. 385, 125 P. 2d 379.) The petitioner has the burden of establishing the alleged grounds for his release and the proof must be by a clear and convincing preponderance of the evidence. (*Bissell v. Amrine,* 159 Kan. 358, 155 P. 2d 413.) See, also, extensive annotation on burden of proof in 146 A. L. R. 369, 413. In view of the court record itself, previously set forth, and the testimony in the habeas corpus proceeding which has been diligently scrutinized, we are obliged to conclude the petitioner has not met the burden of proof with respect to any of the above claims. We may also say the commissioner was

not convinced these claims were established. Here we have not only the judgment but the court record upon which it was based and the testimony in the instant proceeding which does not overthrow the judgment.

In the commissioner's comments he mentioned petitioner's hearing was impaired but he made no finding petitioner did not hear the statements of the district judge or that he did not understand them. The petitioner's evidence has been carefully examined with that specific question in mind, including his straightforward and clear answers to the district court's interrogation of him at the hearings to determine the sentence. We have also observed the district court gave petitioner opportunity after opportunity to ask questions at three different hearings in the event there was anything he wanted to know or did not understand. There was no direct evidence touching the extent of the impairment of petitioner's hearing. Consideration of the entire record does not permit us to conclude his hearing was impaired to such an extent that he did not understand the court's explanations.

Moreover, Leroy E. Harris, petitioner's counsel in the criminal case, was of the opinion, at the time the plea was entered, that petitioner understood the district court and also understood his own explanations of all these questions when he advised petitioner regarding them prior to the plea. He said he changed his mind concerning that matter after the petitioner was committed to the penitentiary. That testimony is not at all convincing to this court. On the date of the plea an emergency was declared and a divorce was granted to Mrs. Miller. Papers were executed to dispose of the home. Petitioner had also executed documents covering compensation to Harris for his services in the criminal case and the divorce case. Harris does not contend they were void. He admitted he thought petitioner would obtain a life sentence and that he and petitioner were surprised at the death sentence. There was no testimony to warrant the belief a life sentence would be pronounced. He had advised the petitioner they would simply have to take their chances on the sentence and throw themselves on the mercy of the court.

Touching the claim petitioner was *non compos mentis* we find no testimony to support that charge. Mental unsoundness is a condition that must be proved. Sanity is presumed until the contrary is established. (*Cochran v. Simpson*, 143 Kan. 273, 277, 53 P. 2d 502.)

Was the plea of the petitioner prompted by a fear of mob violence? The possibility of that gave this court some early concern. Petitioner is a negro and was represented in the criminal case by counsel of his own race. By reason of the racial situation and for good cause shown, which will be treated presently, this court, with consent of appellant's counsel, appointed the Honorable Edward Rooney with directions and authority to confer with appellant and his counsel and to do any and all acts proper to present the criminal appeal to this court and to take such further proceedings as he deemed necessary or proper to have the legal rights of the appellant adjudicated. This court was determined no racial involvements, fear from mob violence or any other cause should interfere with the full protection of appellant's substantial rights. Pursuant to our action appointed counsel alone filed the instant proceedings in habeas corpus. From the action taken by this court it does not follow and it must not be presumed the judgment of conviction is void. That is precisely the question the instant proceeding is designed to determine.

There is testimony in the habeas corpus proceeding that petitioner was struck and threatened by the mob, that a rope was tied around one of his feet and that he was dragged from the garage for a distance of from five to eighteen feet, according to the testimony of different witnesses, before he was rescued by the officers. Parts of this testimony of the petitioner with respect to mob violence were corroborated. There was some conflict in the evidence with respect to whether an injury to one knee resulted from coming in contact with a box which he struck in the garage as he descended from the loft or whether it was the result of mob violence. There was also some conflict in the evidence as to whether blood which he was spitting was caused by acts of the mob or from bleeding gums resulting from a bad case of pyorrhea. The doctor who treated petitioner in the county jail testified petitioner had a very bad case of pyorrhea, that it caused his gums to bleed, that he treated him for that ailment and for a stomach disorder but found nothing else seriously wrong with petitioner. Some blood was found on his cap, on boards in the loft of the garage where he had been hiding and on shotgun shells in his pocket. That condition existed prior to the time he was touched by the mob. He was not hit by any of the bullets that were fired into the top of the garage. There were no abrasions on his body after the officers rescued him from the mob.

The testimony of the officers and of the petitioner himself was that there was no disorder of any kind or character after the officers took him in charge. The petitioner also testified he was nervous but he was not in fear of mob violence at the time he entered his plea of guilty four weeks later. There was no semblance of mob violence, threats or the slightest sign of disorder at any of the district court hearings. In fact the commissioner found that any apprehension as ·to the safety of the petitioner or his counsel was "wholly unfounded." The commissioner also found the officers were to be commended for their fair treatment of petitioner. In view of this record the claim petitioner entered his plea of guilty by reason of fear is not sustained.

We return to a further contention petitioner was not adequately represented. Concerning the training and professional experience of his counsel the record discloses: Leroy E. Harris, a negro lawyer, attended Washburn law school three years; he was admitted to the bar in the state of Kansas under reciprocity from the state of Missouri, and has practiced law at Lawrence, Kan., since February, 1929; he is justice of the peace in the city of Lawrence; he had previously handled one murder case in Missouri and one in Kansas; he has been engaged as counsel, according to his testimony, in about one hundred fifty cases; he has been employed as a special prosecutor for the state in five criminal cases; he is generally familiar with criminal practice and procedure.

Respondents contend the judgment in this case is not void by reason of inadequate representation. They rely on the following testimony which, in substance, was:

Harris was counsel of Miller's own choosing. Miller employed Harris the day after the shooting occurred. Miller and Harris had four conferences during the month prior to the plea of guilty. The first lasted only about five minutes. Another lasted approximately an hour and a half. The latter was a private conference in a separate room at the county jail. Harris also conferred privately but briefly with Miller on the morning prior to the plea. No request for a private conference was denied by the police officers. Harris was present and represented Miller at every stage of the criminal proceedings. He cross-examined the. important witnesses at the preliminary hearing on March 10. He obtained a copy of the information when filed in the district court and a copy of the transcript of proceedings at the preliminary hearing.

According to Harris' own testimony he had discussed the subject of a plea of guilty with Miller prior to the plea. He also told Miller he would consider the question of change of venue. He explained to Miller his right of trial by jury and that the penalty in the event of a plea of guilty might be life imprisonment or death. He and Miller thought it over and talked it over. If he had the slightest doubt of a client's guilt he would not permit his client to plead guilty. Miller had confessed his guilt to him. After discussing the case with Miller and after studying it he became convinced Miller was guilty of the charge. They discussed the subject of a plea of guilty and decided that in view of all the circumstances the best thing for Miller to do was to plead guilty, to throw himself upon the mercy of the court and to take his chances on the sentence. They knew they were taking a chance on the sentence. He explained Miller's rights to him to the best of his ability. Prior to the plea he had two conferences with the county attorney concerning the subject of sentence. In the first conference he sought to obtain a promise from the county attorney to recommend a life sentence to the district court in the event Miller pleaded guilty. This attempt proved unsuccessful. He later returned for a second conference and obtained an agreement from the county attorney that the latter would make no recommendation for the death sentence if Miller pleaded guilty. Miller pleaded guilty to murder in the first degree and the county attorney made no recommendation with respect to the sentence.

Other testimony relied on by respondents with respect to services performed by Harris, in substance, is:

Harris cross-examined eight of respondents' eleven witnesses at the hearing to determine the sentence. Following that he made an argument urging a life rather than a death sentence. The district court recognized the skillful manner in which Harris had created an atmosphere of sympathy for his client. On March 11 the court accepted the plea of guilty. Although Miller had pleaded guilty Harris, with the consent of the district court, filed a motion for a new trial on March 15. Harris argued that motion on March 19. It was overruled. On March 20 Harris perfected an appeal to this court. He later employed F. B. Dodds, an attorney at Lawrence, to assist him in the appeal. Harris and Dodds subsequently filed a motion to dismiss the appeal for the reason that the questions they intended to raise by appeal, but could not, would be determined in the instant proceeding in habeas corpus.

The testimony of Miller in the habeas corpus hearing, in substance, was:

Harris did not advise him of his right to a trial by jury, concerning the meaning of a plea of guilty or the possible penalties. He spit blood by reason of the injuries he sustained at the hands of the mob at the garage where he was hiding. He pleaded guilty by reason of threats of police officers that he had better do so. He feared he would be killed by a mob if he did not plead guilty. He did not understand everything the district judge said to him. He saw the chief and his own wife approaching the garage at his home. He became scared and shot. He did not know the difference between murder in the first and second degree. He fired only one shot. He did not intend to kill the chief but he did intend to shoot his wife. The chief stepped in front of his wife just before he shot. He did not intend to kill his wife but wanted to hurt her. He intended to shoot his wife because they had an argument and he was mad. The shotgun was his own. The pistol which he also had in the garage he had borrowed from a friend.

The testimony of Miller with respect to the things he said Harris did not tell him is in conflict with that of Harris, his own witness. Miller's uncorroborated testimony that he did not know he was entitled to a trial by jury, the meaning of a plea of guilty or that he might receive the death penalty is also directly contrary to what the court record discloses the district judge told him. The records of courts are not set aside upon the unsupported statements of a defeated litigant. (*Cochran v. Amrine*, 153 Kan. 777, 113 P. 2d 1048.)

An attorney, F. B. Dodds, of Lawrence, who entered the case on behalf of petitioner after the commitment to the penitentiary, in substance, testified: He was employed by Harris to assist him in the criminal appeal. He saw Miller on several occasions in the penitentiary. Miller was at first reluctant to talk but later told him of the mob action on February 3, that people kicked and struck him, threatened to tie him to a car and drag him through the streets and that he believed their threats. Miller thought the conduct of the mob aggravated his inability to hear well and that he continued to labor under fear of the threats. Dodds said Miller told him he pleaded guilty because he did not want to be killed by a mob.

Respondents moved to strike the hearsay portion of Dodds' testimony. The commissioner received the testimony subject to the ob-

jection. In view of the commissioner's finding, previously mentioned and with which we agree, that any apprehension of mob violence at the time petitioner entered his plea was "wholly unfounded" we need not discuss the merits of the objection to the hearsay testimony.

In order to set aside the judgment of conviction it must, of course, be void. (*In re Light*, supra.) Counsel for petitioner contends it is void and respondents contend it is not. While some other alleged omissions of representation were found by the commissioner the principal ground on which petitioner seeks to have the judgment declared void is the following:

"I further find and there is nothing in this record to show that LeRoy Harris, as petitioner's counsel, explained the petitioner's rights to him. There is nothing in this record to indicate that the defendant, petitioner, fully understood what his rights were and the impression and opinion of your commissioner is that both the petitioner's counsel and the petitioner gave no consideration to anything other than first-degree murder and there is a serious doubt in the mind of your commissioner that petitioner fully understood his rights and the possibilities of a trial by jury."

It is fundamental that a plea of guilty, in order to be valid, must be freely, knowingly and understandingly made. (*Engels v. Amrine*, 155 Kan. 385, 125 P. 2d 379; *Willey v. Hudspeth*, 162 Kan. 516, 522, 178 P. 2d 246; *People v. Chesser*, 29 Cal. 2d 815, 178 P. 2d 761.) Otherwise it is a violation of the constitutional guarantee of due process and the judgment is void. (*Garrison v. Amrine*, 155 Kan. 509, 512, 126 P. 2d 228; *Willey v. Hudspeth*, supra, p. 523; *Dunfee v. Hudspeth*, 162 Kan. 524, 178 P. 2d 1009.)

If the judgment of conviction is to be overthrown on the above finding it must be done on doubts that the judgment is valid and on the theory there is an absence of evidence to support the judgment. We pause first to repeat there was evidence of petitioner's witness, his own counsel in the criminal case, that he had advised petitioner of his various rights to the best of his ability, that they thought over and talked over the case and the question of pleading guilty to the charge and the county attorney was approached to obtain a promise to recommend a life sentence on a plea to the charge. If a judgment of conviction is to be set aside in a case *where a defendant had counsel of his own choosing* on the ground the defendant did not know the difference between murder in the first and second degree the evidence should clearly establish that fact. It does not do so. Moreover it is the duty of a defendant's

counsel to determine what crime the facts, in his opinion, establish and to advise his client accordingly. That is one of the definite purposes of having counsel. A layman is not presumed to know the legal technicalities involved in a charge of murder or manslaughter in the various degrees. The record, previously narrated, discloses petitioner's former counsel testified he had become convinced of petitioner's guilt and that he would not have permitted his client to plead guilty to the charge if he had not become convinced of his guilt. In view of the entire record as to the manner in which this crime was committed, including petitioner's own statements of intent, we think we would not be justified in finding his counsel had not considered the question of murder in the second degree. Nor would we be justified in finding his counsel was unwarranted in concluding the evidence established murder in the first degree and that the best thing for his client to do was to plead guilty and throw himself on the mercy of the court.

Moreover, there is some indication the above finding may have been based on the theory the record in the instant proceeding was required to affirmatively disclose counsel for defendant had fully performed his duties in the criminal case. Such a theory shifts the burden of proof. The burden in habeas corpus proceedings rests on the petitioner to prove the grounds on which he seeks to invalidate the judgment (*Johnson v. Zerbst*, 304 U. S. 458, 468, 58 S. Ct. 1019, 82 L. Ed. 1461), and, as previously shown, he must on a collateral attack make that proof by a clear preponderance of the evidence. He did not do that.

It is, of course, elementary, that the innocence or guilt of a defendant is not justiciable in habeas corpus proceedings. (*Garrison v. Amrine*, 155 Kan. 509, 513, 126 P. 2d 228; *Downs v. Hudspeth*, 162 Kan. 575, 580, 178 P. 2d 219.) But certainly the facts and circumstances surrounding the commission of a crime are properly considered together with all other evidence when courts are asked to nullify a judgment of conviction after a plea of guilty on the ground defendant's counsel did not consider the various degrees of murder before advising his client relative to a plea of guilty. Many a defendant after being carefully advised by the most able counsel might in perfect honesty, after a plea and commitment, say he did not know and could not state the elements of an offense in its various degrees. Such inability is not limited to laymen. That lawyers and courts have their difficulties with those subjects, especially with degrees of manslaughter, is disclosed by various decisions.

Certainly no representation of one charged with a felony should be a sham or constitute mere token service. The representation should be loyal and genuine. On the other hand surely caution must be exercised in permitting a judgment to be disturbed on a subsequent statement of one who has entered a plea of guilty that he did not understand the advice of his personally selected counsel. The importance of this recognized principle is clearly indicated where writs were denied on the ground of alleged inadequate representation of various kinds. A few of them are *Ex parte Haumesch*, 82 F. 2d 558; *Minnec v. Hudspeth*, 123 F. 444; *Pierce v. Hudspeth*, 126 F. 2d 337; *Tompsett v. State of Ohio*, 146 F. 2d 95, 98; *Diggs v. Welch*, 148 F. 2d 667; *United States v. Thompson*, 56 F. Supp. 683; *Ex Parte Kramer*, 61 Nev. 174, 122 P. 2d 862.

In the first five of the last cited cases the defendant was represented by counsel of his own choice. In the Thompson case, *supra*, it was said:

"The lawyer assigned was neither very young nor inexperienced. Unquestionably, now that the record is made, able counsel can go over every question and perhaps frame a better one, may assign better reasons for objections taken, may suggest avenues of cross-examination which did not occur to him who actually faced the court and jury. So, too, military strategists go over the movements of lost battles and demonstrate how it might have been won. The short answer to this line of argument is that the constitution does not guarantee the assistance of the most brilliant counsel." (p. 688.)

In the Pierce case, *supra*, it was held a writ will not be allowed on the ground of alleged inadequate representation relative to matters over which competent counsel might well disagree.

The established rule with respect to representation by counsel employed by a defendant is well summarized in the Tompsett case, *supra*, as follows:

"The incompetency or negligence of an attorney employed by a defendant does not ordinarily constitute grounds for a new trial and a fortiori will not be grounds for the application of the Fourteenth Amendment. [Citations]

"The concept of this rule is that the lack of skill and incompetency of the attorney is imputed to the defendant who employed him, the acts of the attorney thus becoming those of his client and so recognized and accepted by the court, unless the defendant repudiates them by making known to the court at the time his objection to or lack of concurrence in them. A defendant cannot seemingly acquiesce in his attorney's defense of him or his lack of it and, after the trial has resulted adversely to defendant, obtain a new trial because of the incompetency, negligence, fraud or unskillfulness of his attorney.

"The foregoing rule has no application when it is made to appear that the defendant is ignorant of his rights and unacquainted with the course of pro-

ceedings in criminal cases. In that event if the attorney selected by such a defendant is so incompetent or dishonest or so improperly conducts defendant's case as to amount practically to no representation, the defendant is prejudiced and thereby deprived of a fair trial and a court should grant relief by use of the writ of habeas corpus." (p. 98.)

The instant record does not permit us to conclude the representation Miller received was tantamount to practically no representation. The increase of habeas corpus cases without the slightest merit filed by prisoners in penal institutions is appalling. In a well-considered opinion in the Diggs case, *supra*, it was said:

"It is well known that the drafting of petitions for habeas corpus has become a game in many penal institutions. Convicts are not subject to the deterrents of prosecution for perjury and contempt of court which affect ordinary litigants. The opportunity to try his former lawyer has its undoubted attraction to a disappointed prisoner. In many cases there is no written transcript and so he has a clear field for the exercise of his imagination. He may realize that his allegations will not be believed but the relief from monotony offered by a hearing in court is well worth the trouble of writing them down. To allow a prisoner to try the issue of the effectiveness of his counsel under a liberal definition of that phrase is to give every convict the privilege of opening a Pandora's box of accusations which trial courts near large penal institutions would be compelled to hear." (p. 669.)

If a lawyer violates his office of trust he should be tried and relief should be promptly granted to his client. But the proof should disclose his dereliction of duty by a clear preponderance of the evidence together with the resulting prejudice to the substantial rights of his client. Manifestly matters which do not affect his substantial rights should not be permitted to nullify a judgment of conviction rendered pursuant to a plea of guilty.

The commissioner's finding a motion for a new trial was not filed in time will be noted. We need not determine whether the motion filed within five days after the acceptance of the plea by the court on March 11 preserved the right of appeal under G. S. 1947 Supp. 62-1723. The court recognized the motion, heard the argument of defendant's counsel in support thereof and overruled it. Of course, where a plea of guilty has been entered there can be no review of the sufficiency of evidence to support the judgment of conviction. (*Crisp v. Hudspeth*, 162 Kan. 567, 178 P. 2d 228.) It would appear the only question, if any, defendant could have raised under a proper record on appeal would have been whether there was an abuse of discretion in determining the sentence. As already indicated herein a review of that question on appeal would not have

resulted in a reversal of the judgment of sentence. It follows petitioner's substantial rights were not prejudiced by a failure to file a motion for a new trial in time, if it were filed too late. A failure to properly perfect an appeal under such circumstances does not constitute a violation of due process. (*Casebeer v. Hudspeth,* 114 F. 2d, 789. See, also, 146 A. L. R. 369, 425.)

A finding counsel should have applied for a change of venue presents a debatable question, assuming grounds therefor existed. The record discloses counsel considered that subject and had advised Miller he would do so. In any event an application for change of venue became unnecessary when Miller' and his counsel decided to enter a plea of guilty.

A finding counsel for Miller should have offered evidence at the hearing for sentence to show his prior good character and reputation has not been overlooked. Manifestly such evidence could not affect the plea of guilty. If effective evidence was available on that subject it, of course, would have been entirely proper and apparently advisable, from a backward look, to have offered it for the purpose of aiding the court in determining what the sentence should be. Mrs. Miller, however, had conceded her husband, insofar as other people were concerned, was a peaceful citizen so far as she knew. Things might have been developed in the cross-examination of other witnesses which would not have aided Miller's cause. Here again the advisability of endeavoring to offer such testimony was a matter which rested in the discretion and judgment of counsel. The examination of Miller by the trial judge briefly but rather clearly portrayed Miller's lack of education, his steady work, children born by a previous marriage, the fact he owned a home and the absence of any prior criminal record.

The district judge recognized and commented on the skillful manner in which Miller's counsel had created an atmosphere of sympathy for his client. All in all, we would not be warranted in concluding, as a matter of law, that counsel's failure to introduce evidence at the hearing for sentence constituted a violation of due process. No authorities to the contrary are cited.

A finding *if* Miller's counsel believed Miller was in fear of mob violence at the time he entered a plea of guilty he should have advised the court of that fact must, of course, be approved. So likewise a finding must be approved that *if* Miller's counsel was laboring under the same fear he should have advised the court and retired

from the case. The commissioner, however, was conscientious in making his findings. He did not find such fear actually existed on the part of either Miller or his counsel. Neither do we. As previously stated, the commissioner also found such fear was "wholly unfounded." The record supports the finding.

A finding tending to indicate Harris should have objected to Miller's wife testifying for the state at the preliminary hearing, and that he should have advised her concerning her rights in the premises, is not a violation of due process. It may also be stated the criminal code merely grants a privilege to spouses not to testify against each other. (G. S. 1935, 62-1420; *State v. Ralston*, 131 Kan. 138, 289 Pac. 409, and cases therein cited.) She, therefore, had a right to testify against her husband if she desired to do so. There is no indication the state did not advise her she was not compelled to testify. And the court was not required to advise her on the subject. (*State v. Woods*, 130 Kan. 492, 287 Pac. 248.)

The petition for the writ alleges the record brought up on appeal in the criminal case presented no question for review. In the order appointing special counsel we did so state. Having, however, previously indicated no substantial right of appellant was prejudiced the subject requires no further treatment.

We previously treated a finding which pertained, in part, to the failure of Miller and his counsel to consider murder in the second degree. The commissioner has also found Miller was not fully, completely and properly advised relative to the distinction between those degrees. Considerable of what was previously stated pertains also to the last-mentioned finding. That need not be repeated. In our opinion it would be sufficient to say the petitioner has not met the burden of proof on that subject. As previously indicated Miller denied knowledge of about everything that was essential to the validity of his plea. That denial included not only what his counsel in the criminal case, his own witness in the instant proceeding, testified he had explained to Miller to the best of his ability .but also what .the district court record so clearly shows the district judge carefully explained to Miller. The record compels us to discount much of Miller's testimony.

The district court, as previously quoted herein, among other things, said to Miller, "Now, having been informed by the court, *and I take it informed by your attorney,* how do you plea to the information just read to you?" (Our italics.) Miller's counsel answered,

"Guilty, Your Honor." The court, however, insisted defendant answer that question. The defendant personally answered it in the affirmative three times in response to three separate questions. And finally in answer to a fourth question stated that he understood what the plea meant.

Moreover, we desire to add that in view of the entire record in the instant proceeding, including Miller's repeated admissions of intent, we simply cannot lay down the law that the plea of guilty and the judgment are void by reason of counsel's dereliction of duty in permitting Miller to plead guilty to murder in the first degree after his counsel became convinced the facts proved Miller was guilty of that charge. That is precisely the difference in cases where a defendant has had no counsel and where he has had the benefit of counsel to consider the facts and to apply the law to the facts for the very purpose of advising his client what crime the facts, in his counsel's opinion, establish. One of the most important reasons for requiring counsel is to protect a defendant from pleading guilty to a charge which the evidence does not establish.

Counsel for petitioner leans heavily on *Powell v. Alabama,* 287 U. S. 45, 53 S. Ct. 55, 77 L. Ed. 158; *Willey v. Hudspeth,* 162 Kan. 516, 178 P. 2d 246; *Dunfee v. Hudspeth,* 162 Kan. 524, 178 P. 2d 1009, and authorities cited in these cases. We are familiar with those cases. In our view they do not require the issuance of a writ under the facts in this case.

From statements made herein it by no means must be inferred that some of the things to which the commissioner has directed attention might not well have been done, or perhaps more effectively done, by counsel in the criminal case. The question of due process, however, cannot be tested by the character of service which would be rendered by one of the commissioner's ability and experience or by that of petitioner's counsel in this proceeding.

This opinion probably has already become too extended. It, however, seemed to us the rights of the petitioner, the conscientious and able service rendered by counsel on both sides and by our commissioner required careful scrutiny of the record. In the final analysis the responsibility for the decision rests on this court. It is a duty that weighs heavily but one we cannot evade.

In our opinion the writ must be denied. It is so ordered.