No. 36,926

THE STATE OF KANSAS, *Appellee*, v. GEORGE MILLER, *Appellant.*

(194 P. 2d. 498)

Opinion filed June 12, 1948.

*Edward Rooney,* of Topeka, *LeRoy E. Harris* and *Frank B. Dodds,* both of Lawrence, argued the cause and were on the briefs for the appellant.

*Willis H. McQueary,* county attorney, of Osawatomie, argued the cause and *Edward F. Arn,* attorney general, was with him on the counter abstract.

The opinion of the court was delivered by

HARVEY, C. J.: About 10 o'clock the morning of February 3, 1947, the appellant, George Miller, a colored man, shot and killed M. F. (Mike) Churchill, the chief of police of the city of Osawatomie, and promptly fled the scene of the homicide. News of the tragedy spread rapidly and police officers, deputy sheriffs and citizens searched for Miller. Some two and one-half or three hours later they located him in the loft of a garage about three blocks from the scene of the homicide, and the officers took him into custody. Perhaps 75 to 100 persons, some of them with guns, who had joined in the search for Miller, were present in or about the garage when he was taken into custody. The officers quelled any outbreak or attack by the persons gathered there, and to further quiet public feeling took Miller to Lawrence and placed him in the Douglas county jail until the next day. On the day following the homicide, and while at Lawrence, appellant employed to represent him LeRoy E. Harris, an attorney of his own race, who previously had been admitted to practice law in the supreme court and all inferior courts of the state. The county attorney filed with a justice of the peace of the city of Osawatomie a complaint charging George Miller with murder in the first degree, upon which a warrant was issued and duly served. The preliminary examination was held on February 10. Mr. Harris was present with his client and cross-examined the witnesses who testified for the state. After hearing the evidence the justice of the peace found that the crime charged had been committed and that there were reasonable grounds for believing defendant committed the offense, and made an order holding him for trial in the district court without bond and committing him to the custody of the sheriff. Thereafter the county attorney filed in the district court an information charging George Miller with the willful, deliberate and premeditated killing of M. F. Churchill, contrary to our statute (G. S. 1935, 21-401).

On March 5, 1947, the case was called in the district court for arraignment and plea. The defendant was present in court in the custody of the sheriff and was represented by his attorney, LeRoy E. Harris, when the following proceedings were had.

"Mr. McQueary (county attorney): At this time the State desires to have the defendant arraigned on the charges contained in the information.

"The Court: Very well, you may stand. (Defendant stands before the court.)

"The Court: You are George Miller? A. Yes sir.

"The Court: And you are represented by LeRoy E. Harris? A. Yes sir.

"The Court: Your attorney? A. Yes sir.

"The Court: Have you had a chance to talk with your attorney? A. Yes sir, I have.

"The Court: Did you talk to your attorney this morning? A. Yes, a little bit.

"The Court: An Information has been filed charging you with murder in the first degree and what we are doing now is to arraign you. That is, we are informing you of this charge. The charge will be read to you by the clerk and you will listen to the reading of this Information and after the Information has been read then you will be asked to plead, but before you plead the Court must further talk to you. You will now listen to the reading of the information. (The clerk here reads the Information.)

"The Court: Defendant, George Miller, you will now be required to plead to the Information. You may stand mute and not answer anything, in which event the Court will order a trial to a jury and you may enter a plea of Not Guilty or you may enter a plea of Guilty.

"Now, a plea of guilty to an Information charging murder in the first degree means that you may be imprisoned for life or that you may suffer the death penalty. Now, having been informed by the Court and I take it informed by your attorney, how do you plea to the Information just read to you?

"Mr. Harris: Guilty, Your Honor.

"The Court: What does the defendant say about it? A. (By the defendant) Guilty.

"The Court (addressing defendant): Is that your plea? A. Yes sir.

"The Court: You enter a plea of guilty to this Information? A. Yes sir

"The Court: And you understand now what that plea may mean? "Mr. Harris: Yes sir.

"The Court (addressing defendant): Do you understand that—so the Reporter may get it? A. Yes sir.

"The Court: You may be seated. (The defendant is seated.)

"The Court: The Court has noted and entered your plea of guilty. That, however, doesn't end the matter because under the law the determination of the punishment will have to be by the Court. The Court takes it that under the law that even a plea of guilty is not a final determination but the plea also has to be approved and in order to determine the matter of punishment and acceptance of the plea the Court will hear evidence."

There was colloquy between court and counsel as to when the evidence could be presented. During this the court said:

"There is no hurry and the defendant still has his rights to have the evidence presented and heard and considered and he still has the right to offer evidence which he might deem expedient. . . . The State has the names of a good many witnesses endorsed on the Information. It may not be necessary to hear all of those witnesses but it will be necessary to hear such of them as will be sufficient to fully inform the Court as to the circumstances surrounding the transaction. The defendant also will be heard as he wishes and it is believed by the Court that it would be probably better to set a time for this hearing, considering all the circumstances and then the County Attorney may select such witnesses as will properly inform the Court and have these witnesses present by subpoena and likewise if the defendant wishes to call any witnesses he may have subpoenas for such witnesses as he may wish to call. . . .

"This case is continued for further proceedings to 9:30 in the forenoon on March the 11th, at which time the witnesses will be heard. The defendant is remanded to the custody of the sheriff and if his attorney wishes to further confer with him you may do so.

"Mr. Harris: All right."

On March 11, when the case was called in court, the state appeared by the county attorney; the defendant appeared in person by his attorney, Mr. Harris. The state introduced the testimony of eleven witnesses. We summarize only the pertinent portions of this evidence. Defendant's wife, called as a witness, was informed by the court that she was privileged not to testify. She waived that privilege and testified that she and her husband had been married almost eight years. Apparently it was the second marriage for each of them. Defendant is a man who did not drink and was regarded as a "peaceful citizen" with others. They lived in Osawatomie and owned their home. The defendant worked for the railroad. He was acquainted with M. F. Churchill, the chief of police, and knew that he represented "the law." Churchill was also acquainted with defendant. The witness testified that on the night before the homicide, and for two or three days prior thereto, she and defendant had been having trouble over money matters and about a pistol and a shotgun; that he had menaced her with the guns and struck her; that on the morning of February 3 she went to the police judge and swore to a complaint for defendant's arrest. The charge that was made was not disclosed by the transcript, but obviously it was for the violation of some city ordinance. Upon that complaint a warrant for the arrest of defendant was placed in the hands of

Churchill, the chief of police, for service. He and Harvey Earp, the city engineer, who acted as his chauffeur, went to defendant's home, but did not find him there. They looked for him at other places about town and finally got Mrs. Miller and returned to defendant's home, found it locked, but Mrs. Miller was able to get in, and the house was searched. The defendant was not in the house. His wife suggested that he might be at the garage and the three of them started toward the garage on a cement walk, Churchill in the lead, Mrs. Miller following, and Earp following her. Churchill was wearing his uniform as chief of police, with a cap and insignia of his office. He called defendant's name twice in a loud voice, but had no response, and continued to walk toward the garage. When five or six feet from the building he was struck in the breast with a charge from a shotgun fired through a hole in the door of the garage. Churchill started to walk back toward the house, but sank down and died in a few minutes. Within two or three minutes after the shot was fired defendant was seen running from the garage as though he had left it from the back door. Earp also testified to the homicide and the incidents leading up to it and to what he did afterwards in calling the other police officers and getting word to the sheriff. The news spread rapidly about town. Witnesses who examined the garage from which the shot was fired soon after the shooting found that part of a board had been torn from the door of the garage and it had been cut away with a knife, making a place large enough that one inside the garage could see through it and shoot through it. There were powder burns on the wood about the hole, indicating that the muzzle of the gun was near there when the shot was fired. Defendant's double-barreled shotgun was found in the garage. One barrel had been shot and the empty shell was lying on the floor. Also defendant's knife was lying open on a box in the garage.

Several witnesses testified that they had known defendant for some years, and the police judge testified that no warrant had previously been issued for defendant from his court. There was no testimony that defendant had a quarrelsome disposition or a bad character in any respect prior to the homicide. The sheriff testified that one day he asked defendant why he had shot the chief of police and he answered that he was mad. Defendant's attorney, Mr. Harris, cross-examined eight of the witnesses. From one of the witnesses who was present at the time defendant was taken

into custody he inquired if there had been confusion among the people who had gathered there, or any threats made at that time against defendant, or if defendant was manhandled in any way, and specifically if he was kicked or hit in the mouth, and received negative answers to each of the questions. Counsel for defendant asked another witness who was present when defendant was taken into custody if defendant had been dragged by a rope, and if the witness had seen a picture in the Kansas City *Star* showing defendant with a rope about his foot. The witness knew nothing of either of those matters. The sheriff testified that after defendant was taken to the county jail at Paola there was no demonstration about the jail, and there is no contention that such demonstration had been made against defendant at the time of his preliminary examination in Osawatomie at any time he appeared in the district court or at any time after he was taken into custody.

While the testimony was being taken there were introduced into evidence various exhibits: Several photographs of the scene of the homicide, the garage door with the hole that had been made in it and the powder burns thereon, the shotgun used, the shell from it, defendant's open pocketknife, and some other items. Counsel for defendant made no objection to the introduction of any of these exhibits, but specifically announced to the court "No objection."

Following the testimony of witnesses called by the state the record discloses the following:

"The Court: Does counsel for the defendant wish to have Mr. Miller to make any statement under oath?

"Mr. Harris: Why?

"The Court: The only issue the Court has to decide is the punishment.

"Mr. Harris: That is all.

"The Court: The defendant is before the Court on a plea of guilty and the defendant may or may not make a statement. He isn't required to testify. If he has anything, however, to offer and counsel thinks he should offer it, the Court, of course, will hear him."

After defendant and his attorney conferred the following occurred:

"Mr. Harris: If Your Honor, we have no testimony to offer and we rest our portion of the case.

"The Court: The Court may wish to ask some questions, which the defendant can answer if he wishes to. The Court will try to avoid any questions that will further incriminate him, but it is necessary that the Court have further information about this situation. Is that satisfactory?

"Mr. Harris: LeRoy E. Harris, attorney for the defendant in this case,

hereby agrees the Court is permitted or can question the defendant in any manner that it sees fit."

Thereafter the court asked defendant questions which brought out the fact that he did not go to school very much, that he went to school in Mississippi, that at Osawatomie he did railroad work on track maintenance. He stated that he knew Mr. Harris, his attorney, had known him three or four weeks; that he became acquainted with him at Lawrence; that he had seen Mr. Harris several times since he was arrested; that Mr. Harris had talked with him several times; that when he was brought into court Mr. Harris was there each time, and defendant talked with him; that at no time since he was arrested had anyone tried to harm him physically; that he had gotten along all right with the sheriff and the sheriff's force. Cautioned that he might answer the question or not, as he wished, he was asked if he had ever been in the penitentiary or in jail for any offense before this, and answered in the negative. The following questions were asked and answered:

"Q. You remember when you were asked to plead guilty or not guilty the other day—do you remember that? A. I do.

"Q. Before you were asked to plead, had anyone made any promises to you? Had the county attorney made any promises to you before you entered your plea? Did he tell you what would happen to you if you entered a plea of guilty? A. No, he didn't.

"Q. And you didn't talk to the judge—you didn't talk to me about it except here in the courtroom? A. No, sir.

"Q. So I understand that no one at all, the county attorney or no one else, before you entered your plea, made any kind of promises to you or told you how to plead? A. No."

The parties having rested, the court accepted defendant's plea of guilty and announced a recess until March 15. On that date the parties appeared in court as before and the following proceedings were had:

"The Court: Mr. Harris, although testimony was taken in this case, does the defendant have anything more to say to the Court by way of informing the Court? Any other voluntary statement to make at this time?

"Mr. Harris: We have nothing further to present to the Court at this time, Your Honor.

"The Court: You have had an opportunity this morning to confer with your client?

"Mr. Harris: Yes, Your Honor."

The court noted the fact that no notice of the filing of a motion for a new trial had been given, which normally should be heard be-

fore the sentence, but suggested the supreme court might be lenient in that respect. The court then, at some length, reviewed the history of the case as shown by the record and the evidence, concluded that all of the elements of first degree murder were definitely shown, took note of the fact that the deceased was a peace officer in the performance of his normal duties, and concluded that "The tragedy, so far as the facts are concerned, is simply a cold-blooded murder of an officer," and inquired of defendant:

"Mr. Miller, at this time do you have any legal cause to offer why sentence and judgment of the Court should not be pronounced upon you?

"Mr. Harris: None, Your Honor.

"The Court: I want to hear from Mr. Miller.

"Mr. Miller (the defendant): I ask that the Court please forgive me.

"The Court: The Court, of course, [recognizes] that you stand here in the meekness of remorse, but it is not a legal reason to avoid the consequences of the crime. . . . Does the attorney for the defendant have anything to say?

"Mr. Harris: No, we have no more, Your Honor, to say.

"The Court: It is the judgment, sentence and order of the Court that you, George Miller, on your plea of guilty to murder in the first degree and after hearing the evidence thereon, shall be punished by being hanged by the neck until dead, between the hours of five and six o'clock in the forenoon of Friday, May 2nd, 1947, at the penitentiary at Lansing, Kansas, and the cost of this prosecution assessed against you. You may be seated."

The court gave further directions for the preparation of the warrant by the clerk to be delivered to the sheriff.

After the sentence was pronounced and on the same day the attorney for defendant filed a motion for a new trial upon the grounds, (1) that the judgment was rendered contrary to the law and evidence; (2) that the decision of the court was erroneous and contrary to the evidence; (3) that new evidence had been discovered which will throw new light on the subject of this matter in that defendant has a silver plate in his head which causes defendant to act peculiar at times; (4) that no premeditated intention was shown; (5) that the circumstances did not show that anyone saw the commitment of the crime; (6) that certain exhibits were admitted in evidence which were of no force and which were detrimental to defendant; (7) that certain witnesses were used as experts, contrary to law; and (8) that the verdict should be set aside and a new trial granted on account of prejudicial statements which jeopardize the interests of defendant. This motion for a new trial was heard by the court on March 19. No additional evidence was offered. After hearing arguments of

counsel the motion was overruled. Upon the same date defendant served and filed a notice of appeal to this court.

The appeal was docketed in this court on March 20, 1947. Upon application of appellant the court, on April 4, made an order staying appellant's execution pending the further order of the court, and set the case for hearing on June 6. By that date no abstract, as required by our Rule 5, had been filed by appellant and the county attorney had filed a motion to dismiss the appeal. Counsel for appellant filed a typewritten transcript of the proceedings in the district court. He also filed a motion for continuance upon the ground that another attorney, Frank B. Dodds, of Lawrence, had been employed to assist in preparing and presenting the appeal, and that the time for the preparation and presenting of the abstract and brief of appellant were inadequate, for several reasons stated. The court continued the case to October, with a specific provision that appellant's abstract and brief should be filed by August 15 or the appeal would be dismissed. On August 15 counsel for appellant filed one typewritten copy of what was denominated an abstract, but which lacked much of being an abstract as contemplated by our Rule 5. Attached to this document was an original affidavit of the appellant, verified July 23, 1947. In this he stated that at the preliminary hearing and at his hearing in the district court he pleaded guilty because of fear of mob violence and of the results that usually come when a mob attacks a negro; that when he was taken to the jail in Douglas county the Miami county officers told him that he should plead guilty, and at the time they were beating him, or had beaten him, they were doing so to make him confess, and that it would do no good for him to complain about his mistreatment when he was arrested; that when he was arrested two policemen were present and permitted the beating to go on and took part in it, and that by fear of what might happen to him he confessed to the murder in the hope of not being hanged by a mob and in the hope of leniency in the case of conviction; that at the time of his arrest he was beaten and mistreated at the hands of a mob composed of officers and others, and the resulting injuries, as detailed in the affidavit, were severe; that he could not hear well and did not understand what was going on in court; that he had had no chance to consult privately with his attorney before the preliminary hearing or when he entered his plea, and that he never had been permitted to talk to an attorney privately until Mr. Dodds visited him in the penitentiary. There was

also attached to the abstract the affidavit of his attorney, LeRoy E. Harris, who in substance testified that he had not been permitted to talk to defendant privately; that each time he had seen him the defendant showed evidence of severe injuries; that his client could hardly understand questions asked him and was in great misery and pain, and that the affiant did not learn of all of these matters until after the appellant was in the penitentiary.

Counsel for appellant also filed a brief, largely devoted to the injuries of appellant at the hands of a mob at the time of his arrest and that thereafter defendant was in fear of his life and felt that he would not have protection even by a friend; that he was under that fear at the time he entered his plea in the district court, and cited several cases having to do with the actions of a mob when a negro was charged with crime. We need not detail all these statements.

The court examined this abstract and brief and concluded they presented no error of the trial court which would justify reversal, but the court was concerned about the statements made in the affidavits of appellant and his attorney. Obviously they had no place in an abstract, since they were never presented to the trial court, and for that reason might have been stricken from the files. However, this court has been careful to inquire into any claims of mistreatment of a prisoner by officers, or by others with the permission of the officers (see, for example, *State, ex rel., v. Jackson,* 139 Kan. 744, 33 P. 2d 118; 100 A. L. R. 1394), and thought that matter should be inquired into. In order that this might be done the court, on August 18, made an order, with the consent of appellant's counsel, appointing Edward Rooney, a lawyer with many years of experience in trial work and in the trial of criminal cases, and the instructor in Criminal Law in Washburn University School of Law, to assist the attorneys for the appellant and to take such further proceedings in this court, or in the trial court from which the appeal was taken, which he should deem necessary or proper to have adjudicated the legal rights of appellant. Mr. Rooney accepted this appointment, and after familiarizing himself with the case and the proceedings therein he filed a habeas corpus action in this court which raised not only the question of the action of the so-called mob, but other questions which were deemed pertinent to preserve appellant's rights. After issues were joined in that proceeding the court appointed a commissioner to hear the evidence, and make

suggested findings of fact and conclusions of law. This was done and the case was properly assigned and presented to this court and an opinion filed (164 Kan. 688, 192 P. 2d 147) denying the writ of habeas corpus.

The evidence in the habeas corpus case thoroughly discounted the inaccurate statements made in the affidavit of appellant and of his attorney filed originally in this court in this case. Indeed, it showed clearly that the chief law enforcement officer of the city, in the performance of the routine duties of his office, and without provocation on his part, had been assassinated by one lying in wait, who fled, still armed with a revolver. The news of the tragedy spread rapidly. Officers and citizens joined in the search. Naturally some of them were armed, not only to effect his arrest but to protect themselves. When he was taken into custody there were some present who might have done him bodily harm, not because he was a negro, but because of the thought that he was a dangerous killer. The officers present promptly quieted all attempts of that character, protected him and took him to a place of safety, and thereafter there was nothing to suggest any interference with the ordinary judicial procedure. The affidavit of the appellant and of his attorney should never have been filed in this court. The inquiry upon that question, as well as others suggested in the habeas corpus proceeding, gives this court confidence of the judicial regularity of the proceedings, not only at the time appellant was taken into custody but thereafter at his preliminary examination and throughout the proceedings in the district court.

After the filing of our opinion in the habeas corpus case this case was set for hearing May 7, 1948, and was duly argued and presented. Prior to that time appellant's counsel had filed a motion to dismiss the appeal. This motion was denied, for, as we interpret our statute (G. S. 1935, 62-2414), when a case of this kind has been appealed and the execution of appellant has been stayed pending the appeal, the judgment of the trial court should be affirmed or reversed. If affirmed this court must appoint a day certain and order the execution of the sentence of the trial court. If the judgment of the trial court is reversed this court would order a new trial, or that the defendant be discharged. Later, appellant's attorney, Mr. Dodds, filed a motion asking permission to withdraw the motion to dismiss the appeal previously filed by him and Mr. Harris. This was denied as a matter of course. Also Mr. Dodds and Mr. Rooney,

as attorneys for appellant, filed a motion asking this court "to consider as a part of the appeal proceedings the testimony, evidence and facts brought forth in the habeas corpus case." This motion was denied for the reason that any case which reaches this court by appeal must be heard and decided upon the record in the trial court from which the appeal is taken.

Our statutes pertinent to this appeal are neither lengthy nor difficult to understand. G. S. 1935, 21-401, reads:

"Every murder which shall be committed by means of poison or by lying in wait, or by any kind of willful, deliberate and premeditated killing, . . . shall be deemed murder in the first degree."

The information in this case was drawn under that section. There is no contention that it did not clearly charge murder in the first degree. Defendant by his plea of guilty confessed all its allegations. Our statute fixing punishment for murder in the first degree (G. S. 1947 Supp. 21-403), so far as here pertinent, reads:

"Every person convicted of murder in the first degree shall be punished by death, or by confinement and hard labor in the penitentiary of the state of Kansas for life. If there is a jury trial the jury shall determine which punishment shall be inflicted. If there is a plea of guilty the court shall determine which punishment shall be inflicted, and in doing so shall hear evidence: . . ."

The record previously set out herein disclosed that the trial court followed this statute. The court made it plain to defendant and his counsel that he was doing so, and the record indicates that they thoroughly understood it. We are neither authorized nor have we any disposition to debate the question of the wisdom of capital punishment. The legislature determines the policy of the state in that regard and enacts statutes which the courts are bound to follow. The trial court followed the statute in this case. Upon the final submission of this case there was no contention made that the trial court should have granted a new trial. In fact, the motion for a new trial was filed out of time. Our statute (G. S. 1947 Supp. 62-1723), clearly contemplates that the motion should be filed and passed upon before sentence. But, passing that, the grounds of the motion were frivolous in view of the record, with the possible exception that new evidence might be offered upon the hearing of the motion. No new evidence was offered or tendered.

Upon the final submission of this case the question, ably argued by counsel, was to this effect: That in hearing evidence before passing sentence the court had before it all the evidence pertain-

ing to the homicide, but did not have before it all the evidence which might have been produced respecting the past life, the good citizenship, the industrious, peaceful disposition of defendant, to enable the court to reach a just determination as to whether the punishment should be life imprisonment or death. The proceedings before the trial court, hereinbefore set out, clearly disclose that the court heard all of the evidence respecting that, or any other matter, which appellant or his counsel desired to present. Also we think it clear from the record that the state never made any attack upon the good citizenship of defendant prior to the offense for which he was convicted. The only evidence pertaining to that matter which crept into the testimony offered by the state tended to show that appellant had been an industrious, peaceable citizen prior to the homicide. In addition to that a presumption to that effect would be indulged, since his character in that regard had not been attacked. So it cannot be said that the court, in pronouncing sentence, did not take into consideration the fact that defendant, previous to the homicide in question, had been an industrious, law-abiding, peaceable citizen. And the court specifically and on the day of sentence advised defendant and his counsel that they might be heard upon any matter they wished to present. We see nothing more the court could have done unless the court itself would have selected persons to be examined, had subpoenas issued for them and had them brought into court to testify. Certainly the court was under no duty to do that. There is at least a possibility that defendant did not want additional evidence upon those matters, but preferred to stand upon what evidence had been shown respecting his good character and the presumption which naturally would be indulged by the court in the absence of an attack of his character by the state.

In a case such as this the legislature has placed upon the trial court the authority and the duty of determining what sentence should be imposed upon the defendant. The record discloses the trial court performed that duty conscientiously and legally. Its judgment, therefore, should be affirmed and an appropriate order made to carry the sentence into execution. It is so ordered.

COWAN, J., not participating.