## MILLER v. HUDSPETH et al.
### No. 3859.

United States Court of Appeals
Tenth Circuit.
July 5, 1949.

Rehearing Denied Aug. 5, 1949.

112

Edward Rooney, Topeka, Kan. (Jacob A. Dickinson and David Prager, Topeka, Kan., on the brief), for appellant.

Willis H. McQueary, Osawatomie, Kan., and Harold R. Fatzer, Topeka, Kan. (Robert H. Miller, Osawatomie, Kan., on the brief), for appellees.

Before BRATTON, HUXMAN, and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

This is an appeal by George Miller from a judgment of the District Court of the United States for the District of Kansas denying his petition for a writ of habeas corpus and remanding him to the custody of the respondent, R. H. Hudspeth, Warden of the Kansas Penitentiary. A brief statement of the essential facts is as follows:

Appellant was arrested, tried, convicted, and sentenced to death in the District Court of Miami County, Kansas, for the murder of F. M. Churchill, Chief of Police of the City of Osawatomie, Kansas. The homicide occurred on February 3, 1947. Petitioner was arrested on the same day, was arraigned in the Justice of the Peace Court on February 5, 1947, a preliminary hearing was held in said court on February 10, and an information was filed against him in the District Court on February 13. On March 5, 1947, he was called in the District Court for arraignment and plea. He was present in person and was represented by his attorney, LeRoy E. Harris, whom he had employed. At the arraignment, the judge asked the defendant to stand, asked him his name, and asked him whether he was represented by LeRoy E. Harris, to which

question he answered in the affirmative. He also told the court that he had had an opportunity to talk to his attorney—that he talked to his attorney that morning. The court informed him that an information had been filed against him charging him with murder in the first degree and what the court was then doing was to arraign him. The court informed him what arraignment meant, advised him that the charge would be read to him by the Clerk, that he should listen to the reading, and that after the information had been read he would be asked to plead, but before he would be required to plead, the court would further talk to him. After the reading of the information, the court advised him that he could stand mute and refuse to answer, in which event the court would order a trial to a jury, or that he could enter a plea of guilty or a plea of not guilty. The court advised him that a plea of guilty to the information charging murder in the first degree meant that he could be imprisoned for life or that he might suffer the death penalty. Having so informed Miller, the court asked him how he desired to plead, whereupon his attorney replied, "Guilty, Your Honor." The court, however, asked what Miller had to say about it, whereupon, Miller answered, "Guilty." The court asked him if he understood what that plea meant and he replied that he did.

The court then informed him that his plea of guilty did not end the matter and that before the court would impose sentence it would hear evidence. The court advised Miller that, "There is no hurry, and the defendant still has his rights to have the evidence presented and heard and considered and he still has the right to offer evidence which he might deem expedient." The court thereupon continued the case to March 11 at 9:30 A.M. On March 11, when the case was called, Miller was present in person and by his attorney, Harris. The State introduced the testimony of eleven witnesses who testified in detail to the circumstances of the killing. All of this evidence is set forth in the two cases before the Supreme Court of the State of Kansas, Miller v. Hudspeth, 164 Kan. 688,

192 P.2d 147, and State v. Miller, 194 P.2d 498, 165 Kan. 228, and will not be repeated at length here. It is sufficient for the purpose of this opinion to say that the record before us shows that Harris, Miller's attorney, cross examined all of these witnesses in detail. At the conclusion of the State's case, the court asked if counsel for Miller desired the defendant to make a statement under oath and if he had any further testimony to offer. After a conference between Miller and Harris, his attorney, the attorney announced that they had no further testimony to offer. Before pronouncing sentence, the court, however, questioned Miller and brought out the fact that Miller had very little education and that what little schooling he had he obtained in Mississippi; that at Osawatomie he did railroad work; that he had never been arrested and had never been in trouble before. The judge developed from Miller himself that since his arrest no one had tried to harm him physically and that he had been well treated by the sheriff's force. He also stated, in response to questions by the court, that no one had made any promises to him before he entered his plea of guilty and that neither the County Attorney nor anyone else had told him how to plead. The court, at the conclusion of this question, again asked Harris, the attorney, whether the defendant had anything more to say to the court by way of informing the court, and was informed that no further statement was desired to be made on behalf of Miller. Thereupon the court imposed the death sentence.

While no timely motion for a new trial was filed, such a motion was filed out of time. The motion was heard by the District Court and was denied, and an appeal was taken to the Supreme Court of Kansas, where the case was regularly docketed. Due to the peculiar nature of the case and the fact that Miller was a Negro and had employed counsel of his own race, the Supreme Court appointed the Honorable Edward Rooney with directions and authority to confer with appellant and his counsel and to do any and all acts proper to present that case to the Supreme Court, and to

take such other proceedings as he deemed necessary or proper to have the legal rights of Miller adjudicated.

After a thorough investigation, and pursuant to the mandate of the Supreme Court, Mr. Rooney instituted an original proceeding in habeas corpus in the Supreme Court of Kansas. The Supreme Court appointed a Commissioner to hold hearings and make findings of fact to be presented to the Supreme Court. This was done and a report was filed with the Supreme Court by its Commissioner in which the Commissioner concluded that the writ should be conditionally allowed; that Miller should not be discharged but should be permitted to return to Miami County to withdraw his plea of guilty, and to have such other lawful proceedings as might be just and proper. This suggestion by the Commissioner was founded upon his conclusion that Miller was not adequately represented and that his rights had not been fully explained to him. The Commissioner based this recommendation on his findings that Miller's attorney should have applied for a change of venue; that on March 3, when the plea of guilty was entered, the plea should have been withdrawn and reentered on the day of the sentence; that his attorney should have filed a timely motion for a new trial; that he should have offered evidence to the court of defendant's long record of service and his good character and standing; that if his attorney believed defendant was in fear, he should have made the same known to the District Judge and the court; that if the attorney himself was in fear, he should have made that known to the court; that his attorney should have made a formal investigation of the feeling in Miami County and should have taken more time for consideration of defendant's rights; that he did not fully and completely advise defendant of the distinction between murder in the first degree and murder in the second degree; that at the preliminary hearing he made no objections to defendant's wife testifying against him; that there is nothing in the record to show that the defendant ever had his rights fully explained to him. The Supreme Court, upon a consideration of the report of the Commissioner, his findings and recommendations, concluded that neither his rights guaranteed by the State or Federal Constitution had been violated and entered an order denying the writ.

Thereafter, Miller's appeal from the judgment of conviction was also heard by the Supreme Court and was considered on its merits. The court again reviewed the case at length and found that no reversible error had occurred and the conviction and sentence of the trial court was affirmed. See State v. Miller, 165 Kan. 228, 194 P.2d 498.

Thereafter petitioner instituted this proceeding for a writ of habeas corpus in the United States District Court for the District of Kansas predicated generally on the ground that he was convicted and sentenced in violation of due process of law as guaranteed by the United States Constitution. The basis for this assertion was the claim that appellant was induced to plead guilty through fear of mob violence and threats of mob violence against both him and his attorney; that he did not have his rights to a trial by jury fully explained to him; and that the attorney who represented him was so wholly incompetent that in fact and in law he was not represented by counsel as contemplated by the Federal Constitution. Appellee, the respondent below, filed a motion to dismiss for lack of jurisdiction and also traversed the issue of violation of due process. The trial court, while expressing some doubt as to its jurisdiction, retained jurisdiction and decided the case on the merits, finding that appellant was represented by counsel within the meaning of the constitutional provision and that his constitutional immunities were not violated. Relief was accordingly denied and this appeal followed.

Here, as in the court below, appellee contends that the trial court lacked jurisdiction to entertain the action because appellant did not apply to the supreme Court of the United States for a writ of certiorari from the decision of the Supreme Court of the State of Kansas in his habeas corpus action filed in that court.

Whether application for certiorari to the Supreme Court from an adverse decision of a state court of last resort in a habeas corpus proceeding involving federal questions is in all instances a prerequisite to the right to institute such an action in a district court has received the attention of the Supreme Court in a number of late cases. In Ex parte Hawk, 321 U.S. 114, 64 S.Ct. 448, 450, 88 L.Ed. 572, the court said that,

"Ordinarily an application for habeas corpus by one detained under a state court judgment of conviction for crime will be entertained by a federal court only after all state remedies available, including all appellate remedies in the state courts and in this Court by appeal or writ of certiorari, have been exhausted."

In White v. Ragen, 324 U.S. 760, 65 S. Ct. 978, 981, 89 L.Ed. 1348, the Hawk decision was cited in support of the pronouncement of the court that,

"Where the highest state court in which a decision could be had considers and adjudicates the merits of a petition for habeas corpus, state remedies, including appellate review, are not exhausted so as to permit the filing of a petition for habeas corpus in a federal District Court, unless the federal question involved is presented to this Court on certiorari or appeal from the state court decision."

In the later case of Wade v. Mayo, 334 U.S. 672, 68 S.Ct. 1270, 1274, 92 L.Ed. 1647, the question was re-examined by the Supreme Court and it was held that certiorari to the Supreme Court was no part of the state procedure for purposes of habeas corpus. Thus the court in the majority opinion said:

"But the reasons for this exhaustion principle cease after the highest state court has rendered a decision on the merits of the federal constitutional claim. The state procedure has then ended and there is no longer any danger of a collision between federal and state authority. The problem shifts from the consummation of state remedies to the nature and extent of the federal review of the constitutional issue. The exertion of such review at this point, how-ever, is not in any real sense a part of the state procedure. It is an invocation of federal authority growing out of the supremacy of the Federal Constitution and the necessity of giving effect to that supremacy if the state processes have failed to do so."

The majority opinion quotes with apparent approval the Hawk case to the effect that "ordinarily" an application for habeas corpus by one detained under a state judgment will be entertained by a federal court only after all state remedies and all appellate remedies, including application for a writ of certiorari, have been exhausted. The Ragen case, holding that a proceeding in habeas corpus in such a case may not be filed in the District Court until all state remedies have been exhausted and until the questions have first been presented to the Supreme Court by certiorari, was not referred to in the opinion. While the dissenting opinion listed the Ragen case in a footnote, it apparently was not cited to support the conclusion that certiorari should be considered as part of the state procedure for purposes of habeas corpus.

■ An analysis of the Mayo case leads to the conclusion that certiorari is no part of state procedure for the purpose of habeas corpus cases originating in state courts, and that while ordinarily a federal district court should not entertain original jurisdiction in such cases where certiorari has not first been applied for, they nonetheless have jurisdiction and are invested with the exercise of a sound discretion in determining whether such jurisdiction shall be exercised.

■ We, accordingly, conclude that the court had jurisdiction and did not abuse its discretion in considering the case on its merits.

Neither is there anything in 28 U.S.C.A. § 2254, which requires a contrary conclusion. That section provides that,

"An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available

State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

"An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."

The language of this section is clear. It simply means that one under confinement from a state judgment must exhaust the remedies available to him in the state courts before he may resort to a federal court. There is nothing in that portion of the section defining what constitutes exhaustion of state remedies supporting a construction that application for certiorari to the United States Supreme Court constitutes a part of a state remedy.

True, since a judgment in a habeas corpus proceeding is not res judicata, appellant could have filed other habeas corpus proceedings in the same court, but in the absence of something new to present, such actions would have been idle gestures, and failing to do so does not constitute a failure to exhaust all state remedies available to him.

▆ It is contended that appellant pleaded guilty while under fear of threats of mob violence. After appellant had killed the Chief of Police, he fled. A posse of approximately fifty persons formed, searched for him and apprehended him. Some were armed with guns and one had a rope and when he was apprehended the rope was placed around his leg and he was dragged from 8 to 15 feet. Some threats of violence were made. There is some testimony in the record that there might have been some threats of lynching and that some bodily violence might have been inflicted upon Miller. The officers, however, immediately took charge of appellant and thereafter all acts of violence and threats ceased. As a precautionary measure, he was removed from the Miami County Jail to the County Jail in Ottawa in Franklin County, where he remained at all times up to the time of his trial and sentence. It

is conceded that he was treated with kindness and consideration at all times by the officers who had him in charge.

As stated, appellant and his attorney both were negroes and there was some intimation that there was feeling against them in the community on that account, but there was no semblence of mob violence, threats or intimidation at any of the times in question subsequent to the original arrest. Approximately six weeks intervened between the time of the arrest and the time the plea of guilty was entered. The Commissioner appointed by the Kansas Supreme Court found that any apprehension or fear on appellant's part was "wholly unwarranted." With this, we are in accord. It is quite clear that if petitioner was under any stress or strain as a result of the happenings on the day of his arrest that the same had disappeared during the six weeks prior to his plea.

▆ The most serious question is whether appellant's attorney was so grossly incompetent and so mismanaged his case that it must be said as a matter of law that he was denied such representation by counsel as the Federal Constitution contemplates. We think it may be fairly said from the record that appellant was not represented by the most skilled counsel, and while it is true that Harris was selected by him, we cannot close our eyes to the circumstances under which he gained his employment or the maneuvers he employed after he took charge of the case. Harris was regularly admitted to practice in Missouri and was admitted to practice in Kansas under the rules of comity between the two states. It seems quite clear that Miller had never heard of Harris at the time he was placed in jail at Ottawa. Harris appeared at his cell, as it were, out of clear sky and stated that he had been asked to call as Miller might need his services. He was unable to remember and never did state who asked him to see Miller. Including his first visit, Harris saw appellant only four times before he entered his plea of guilty and all four visits did not consume more than one hour of time and a considerable portion of this time seems to have been spent in discussing Miller's finan-

ces and ascertaining how much property he had.

On one of these visits, Harris took what money appellant had on him, also his watch and chain. On another occasion he took a deed to Miller's house to himself and Miller's wife who on the same day filed a divorce petition, had an emergency declared, and a divorce decree entered on the same day, thus despoiling Miller of his wife and all his property at the same time. But these facts in themselves are not sufficient to establish that Miller was denied the representation contemplated by the Constitution. It is claimed that Harris did not explain and that Miller did not fully understand his rights to a trial by jury, the difference between murder in the first degree and second degree, that the penalty in the event of a plea of guilty might be either life imprisonment or death, and that Miller entered his plea of guilty to murder in the first degree in ignorance of these rights.

We are forced to the conclusion that the evidence before the trial court was sufficient to sustain the finding of the court that these rights were explained to Miller and that he understood them at the time he entered his plea.

Harris' testimony, as might be expected, was in conflict. According to the facts set out in the Supreme Court's opinions, he first testified that he had discussed the subject of a plea of guilty with Miller prior to the plea; that he also told Miller he would consider the question of a change of venue; that he explained to him his right to a trial by jury and the penalty in the event of a plea of guilty; that he and Miller thought it over and talked it over and decided that in view of all of the circumstances, the best thing for Miller to do was to plead guilty and to throw himself upon the mercy of the court and to take his chances with the court on the sentence. Later on, at the habeas corpus hearing, he testified to a somewhat different state of facts. He there testified that he did not advise him fully of his right to a trial by jury, concerning the meaning of a plea of guilty or the possible penalties, and that Miller pled guilty because he feared he would be killed by a mob if he did not plead guilty and that he did not understand everything that the district judge told him.

The quoted conversation between the trial judge and Miller at the time of his arraignment, plea of guilty, and sentence, as set out in the Supreme Court's opinion in State v. Miller, 165 Kan. 228, 194 P.2d 498, impels the conclusion that Miller did have these rights fully explained to him. Thus, it appears that the case was called for arraignment in the District Court on March 5, 1947, where the following colloquy occurred between the court, appellant and his attorney, Harris.

"The Court: You are George Miller? A. Yes sir.

"The Court: And you are represented by LeRoy E. Harris? A. Yes sir.

"The Court: Your attorney? A. Yes sir.

"The Court: Have you had a chance to talk with your attorney? A. Yes sir, I have.

"The Court: Did you talk to your attorney this morning? A. Yes, a little bit.

"The Court: An Information has been filed charging you with murder in the first degree and what we are doing now is to arraign you. That is, we are informing you of this charge. The charge will be read to you by the clerk and you will listen to the reading of this Information and after the Information has been read then you will be asked to plead, but before you plead the Court must further talk to you. You will now listen to the reading of the Information. (The clerk here reads the Information.)

"The Court: Defendant, George Miller, you will now be required to plead to the Information. You may stand mute and not answer anything, in which event the Court will order a trial to a jury and you may enter a plea of Not Guilty or you may enter a plea of Guilty.

"Now a plea of guilty to an Information charging murder in the first degree means that you may be imprisoned for life or that you may suffer the death penalty. Now, having been informed by the Court

and I take it informed by your attorney, how do you plead to the Information just read to you?

"Mr. Harris: Guilty, Your Honor.

"The Court: What does the defendant say. about it? A. (By the defendant) Guilty.

"The Court: (addressing defendant): Is that your plea? A. Yes sir.

"The Court: You enter a plea of guilty to this Information? A. Yes sir.

"The Court: And you understand now what that plea may mean?

"Mr. Harris: Yes sir.

"The Court (addressing defendant): Do you understand that—so the Reporter may get it? A. Yes sir.

"The Court: You may. be seated. (The defendant is seated.)

"The Court: The Court has noted and entered your plea of guilty. That, however, doesn't end the matter because under the law the determination of the punishment will have to be by the Court. The Court takes it that under the law that even a plea of guilty is not a final determination but the plea also has to be approved and in order to determine the matter of punishment and acceptance of the plea the Court will hear evidence."

Then there was a colloquy between the court and counsel as to when the evidence could be presented. During this the court said:

. "There is no hurry and the defendant still has his rights to have the evidence presented and heard and considered and he still has the right to offer evidence which he might deem expedient. * * * The State has the names of a good many witnesses endorsed on the Information. It may not be necessary to hear all of those witnesses but it will be necessary to hear such of them as will be sufficient to fully inform the Court as to the circumstances surrounding the transaction. The defendant also will be heard as he wishes * * *."

Thereupon the court set the case for hearing at 9:30 in the forenoon of March 11. On March 11, a hearing was had before the court at which the state introduced eleven witnesses who testified in detail to the facts and circumstances surrounding the homicide. Harris, appellant's attorney, cross examined these witnesses at length as to the evidence given on direct examination. True, the cross examination was not effective from the standpoint that it developed anything in extenuation or mitigation of the offense which had been committed. After the state closed its testimony at this hearing, the court said:

"The Court: Does counsel for the defendant wish to have Mr. Miller to make any statement under oath?

"Mr. Harris: Why?

"The Court: The only issue the Court has to decide is the punishment.

"Mr. Harris: That is all.

"The Court: The defendant is before the Court on a plea of guilty and the defendant may or may not make a statement. He isn't required to testify. If he has anything, however, to offer and counsel thinks he should offer it, the Court, of course, will hear him."

. After a conference between the appellant and his attorney, Harris replied:

"If Your Honor, we have no testimony to offer and we rest our portion of the case."

Thereupon the court said:

"The Court may wish to ask some questions, which the defendant can answer if he wishes to. The Court will try to avoid any questions that will further incriminate him but it is necessary that the Court have further information about this situation. * * *."

Thereupon the court asked Miller and he testified as to his background. He testified in response to questions by the court that he had had but little schooling and what schooling he had was in the State of Mississippi; that at Osawatomie he did railroad work on track maintenance; that he had known Harris, his attorney, for about three or four weeks; that he became acquainted with him at Lawrence; that he had seen Harris several times since he was arrested; that Harris had talked with.

him several times; that when he was brought into court Harris was there each time and defendant talked to him; and that at no time since he was arrested had anyone tried to harm him physically and that he had gotten along all right with the sheriff and the sheriff's forces. He testified that he had never been in the penitentiary or in jail for any offense. He was asked whether before he had entered a plea of guilty anyone had made him any promises to which he replied that they had not; that he had not talked to the judge prior to that time and that neither the county attorney nor anyone else had told him how to plead. Thereupon the court again advised Harris that he would be glad to hear any other statement in behalf of appellant, to which Harris replied that they had nothing further to present to the court.

From a detailed recital of these proceedings before the trial court, it is clear that appellant's rights were fully explained to him, as fully as it was possible for anyone to do; that he was told before he pled guilty that the sentence upon such a plea might be life imprisonment or death. The conclusion is inescapable that petitioner was denied no constitutional rights at the time he appeared before the court and entered his plea of guilty. In fact there never was any question about his guilt of murder in the first degree. His counsel who so ably and so earnestly represents him in this proceeding conceded in the trial before the District Court that it was clearly a case of murder in the first degree and the only question for decision at that time was whether Miller should, notwithstanding, take his chances before a jury or before the judge. We can see no deprivation of constitutional rights or guarantees in the proceedings up to that point.

■ A much more serious question arises with regard to the hearing had before the judge on the question of the imposition of the sentence. The question then was whether life imprisonment or death should be imposed and the purpose of that hearing was to develop any extenuating facts or circumstances which might tend to influence the court to impose a life sentence rather than death. The

close question is, was appellant represented by counsel at that stage of the proceedings within the constitutional concept. Representation may be present and yet be "so lacking in those fundamental precepts of justice as to amount to a denial of due process * * *. The substance of due process may be denied although the accused is represented by a coterie of counsel, * * *." Amrine v. Tines, 10 Cir., 131 F. 2d 827, 832, 833; Snell v. United States, 10 Cir., 174 F.2d 580.

■ The conclusion is inescapable that Harris wholly and completely failed to present any pertinent or relevant matter at that hearing going to that question. All he did was to cross examine the witnesses as to the circumstances under which the homicide had occurred. He did not go out and attempt to obtain evidence as to the good moral character and the good standing of this rather ignorant negro in the community or such other matters which might tend to influence the court in its judgment, but the court did this for him by its examination of appellant. Through these questions the court developed the fact that Miller was a poor ignorant Negro, born and reared in Mississippi with very little education, who had gone to Osawatomie where he had led a lawful industrious life, that he had never in his life been arrested for any offense. It is doubtful whether much more could have been developed. But in any event that is not the test by which we determine the constitutional question whether appellant was denied the right to have the effective assistance of counsel. A new trial may not be declared and a petitioner may not be released from custody because of mistakes on the part of his counsel. If the test to be applied depended upon the skill with which a defendant was represented, there never would be any finality to a trial. As we said in Hudspeth v. McDonald, 10 Cir., 120 F.2d 962, 968:

"There is a vast difference between lacking the effective assistance of competent counsel and being denied the right to have the effective assistance of competent counsel. It is the denial of the right to have such assistance that gives the right to chal-

lenge a judgment of conviction by writ of habeas corpus."

Of course it is possible for a case to be so grossly bungled or mismanaged that as a matter of law it must be said that the defendant was deprived of the assistance of counsel. But viewed in its entirety, this is not such a case.

■ Under all the facts and circumstances as shown by the record, we cannot say that the trial court erred in holding that appellant was not denied the right to have the aid of counsel or that the ineptness or lack of skill on the part of counsel selected by appellant was so gross as in law to amount to no representation by counsel.

The judgment of the trial court is, therefore affirmed.

BRATTON, Circuit Judge.

I concur in the affirmance of the judgment but on a different ground from that expressed in the able opinion of Judge Huxman.

Congress has the undoubted power under the Constitution to vest in federal district courts exclusive, concurrent, or limited jurisdiction of a certain class of cases, or it may attach conditions to the exercise of such jurisdiction. Lockerty v. Phillips, 319 U.S. 182, 63 S.Ct. 1019, 87 L.Ed. 1339; National Mutual Insurance Co. v. Tidewater Transfer Co., 69 S.Ct. 1173.

Section 2254, Title 28, United States Code, in force at the time of the institution of this proceeding in the court below, provides that an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the state, or that there is an absence of available corrective process or the existence of circumstances which render such process ineffective to protect the rights of the prisoner. The statute constitutes a Congressional command that the district courts of the United States shall not exert their jurisdiction in granting a writ of habeas corpus in behalf of a person in custody pursuant to a judgment of a state court unless it

affirmatively appears that he has exhausted all remedies available to him in the courts of the state, or unless it affirmatively appears that there is an absence of available state process, or unless it affirmatively appears that circumstances exist which render such process ineffective to protect his rights. The effect of the statute is to withhold from the district courts jurisdiction to grant a writ of habeas corpus in behalf of one in custody pursuant to the judgment of a state court unless it affirmatively appears that one of the three enumerated conditions obtains. Any other construction would dilute the statute and render it nugatory. Any other interpretation would render its enactment a mere idle gesture without substance or effect.

The Supreme Court of Kansas heard and disposed of the criminal case against petitioner on its merits. State v. Miller, 165 Kan. 228, 194 P.2d 498. And it also heard and disposed of the proceeding in habeas corpus on its merits. Miller v. Hudspeth, 164 Kan. 688, 192 P.2d 147. The portals of the court were wide open to petitioner in both cases. The constitutional questions presented here were then available for presentation to that court, and they were presented and determined in the habeas corpus case. Rule 16 of the Supreme Court of Kansas expressly authorizes the filing of a motion for rehearing at any time within twenty days after the decision of the case. No such motion was filed either in the criminal case or in the proceeding in habeas corpus. No petition for certiorari in either case was submitted to the Supreme Court of the United States. And where the highest court of a state in which a decision could be had considers and adjudicates on its merits an appeal in a criminal case, and also adjudicates and determines on its merits a proceeding in habeas corpus in which it is urged that the rights of the petitioner under the Constitution of the United States were not protected in the criminal case, and no motion for rehearing is filed in the state court and no petition for certiorari is submitted to the Supreme Court of the United States, available state remedies are not exhausted so as to permit a federal district court to entertain a

proceeding in habeas corpus to free petitioner from custody pursuant to the judgment in the criminal case.

It is my conclusion that for the reasons outlined herein the judgment should be affirmed.